UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILMA PENNINGTON-THURMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:19-CV-162 PLC |
| ) | |
| CHRISTIAN HOSPITAL NORTHEAST, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Christian Hospital Northeast's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). [ECF No. 17] For the following reasons, Defendant's motion is granted in part and denied in part.

I. **Procedural and Factual Background**

The facts, as alleged in Plaintiff's *pro se* complaint, are as follows: At 3:45 a.m. on January 31, 2017, Plaintiff, a "two-time cancer patient under the care of oncologist Dr. Juan Carden," arrived by ambulance at Defendant's emergency department. [ECF No. 1 at ¶¶ 1, 5] Plaintiff was suffering "severe leg cramps, 'Charlie [sic] Horse' in both thighs, legs and feet." [Id. at ¶ 2] Emergency department staff assigned Plaintiff to a bed and left her "screaming for help from her room due to pain on scale of 10[.]" [Id. at¶¶ 3-4]

At 4:05 a.m., a nurse noted: "Patient screaming and thrashing around bed. Denies injury states cramps in Rt thigh. Very difficult to evaluate." [Id. at ¶ 8] At 4:27 a.m., Dr. Derrick Lowery reviewed "Plaintiff's chart from May 22, 2009," which contained a "flag…to contact" Dr. Carden. [Id. at ¶¶ 5-6] Dr. Lowery did not contact Dr. Carden. [Id. at ¶6] At 4:42 a.m., a

nurse noted that she had placed a fall risk armband on Plaintiff and wrote: "Meds per orders. Pt continues to scream out of control[.] ERP aware." [Id. at ¶ 9]

Dr. Lowery saw Plaintiff at 5:12 a.m. [Id. at ¶ 11] At that time, Dr. Lowery was unable to obtain information from Plaintiff because she was screaming, and he informed her he would "come back after the shot has worked."[1] [Id.]

At 5:49 a.m., Plaintiff denied pain or discomfort and no longer appeared to be in distress. [Id. at ¶ 12] At that time, a nurse advised Plaintiff that her bloodwork was "fine" and presented Plaintiff with "release papers." [Id. at ¶ 14] Plaintiff informed the nurse that "she did not want to sign the release papers because she did not feel well." [Id. at ¶ 15] In response, the nurse summoned the head nurse. [Id.] Despite telling the head nurse that she was "going to throw up," the head nurse stated that Plaintiff was "not going to be admitted to the hospital." [Id.] After Plaintiff threw up, emergency department staff wheeled Plaintiff to the waiting room and left her "slumped over in the wheelchair" until sometime after 8:00 a.m., when Plaintiff's sister arrived to pick her up. [Id. at ¶¶ 15-16]

Plaintiff filed a complaint against Defendant and Dr. Lowery[2] seeking monetary relief for alleged violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42

---

[1] Plaintiff alleged that the "pain shot was a narcotic." [Id. at ¶ 15]
[2] The Court dismissed with prejudice Plaintiff's claims against Dr. Lowery because EMTALA does not permit a private cause of action against an individual physician. [ECF No. 11 (citing King v. Ahrens, 16 F.3d 265, 270-71 (8th Cir. 1994))] Because the Court dismissed Plaintiff's federal claims against Dr. Lowery, it "decline[d] supplemental jurisdiction over any state law claims plaintiff may or may not have against Dr. Lowery." [Id. at 6] Plaintiff filed a "motion to alter or amend," requesting the Court to reconsider its order dismissing her claims against Dr. Lowery. [ECF No. 15] On June 3, 2019, the Court denied the motion. [ECF No. 24]
 Now, in response to Defendant's motion to dismiss, Plaintiff argues that, having granted her the privilege of proceeding in forma pauperis, the Court could not dismiss her claims against Dr. Lowery prior to service of process. [ECF No. 27 at 2] In support of her position, Plaintiff cites a Third Circuit opinion which interpreted an earlier version of the in forma pauperis statute. See Outess v. Sobolvetich, 914 F.2d 428 (3d Cir. 1990). However, the current in forma pauperis statute provides that a court shall dismiss "at any time" a complaint that is frivolous, fails to state

U.S.C. § 1395dd, and claims of medical malpractice. [Id.] More specifically, Plaintiff claimed Defendants violated EMTALA by failing to: (1) provide appropriate medical screening because they believed Plaintiff lacked health insurance; and (2) stabilize Plaintiff prior to discharge. [Id.]

Along with her complaint, Plaintiff filed an affidavit stating that she obtained the written opinion of "a qualified health care provider," as required by Mo. Rev. Stat. § 538.225. [ECF No. 1 at 18] Plaintiff identified Dr. Sebastian Rueckert, Defendant's vice president and regional chief medical officer, as the qualified health care provider. [Id.] She averred that Dr. Rueckert provided an opinion, in the form of a letter, which stated that Defendant "failed to provide the kind of treatment that 'a reasonably prudent and careful healthcare provider would have under similar circumstances'" and "[t]his failure caused or contributed to the harm alleged in the lawsuit." [Id.] Plaintiff attached Dr. Rueckert's letter to the affidavit. [ECF No. 1-1]

Defendant moves for dismissal for failure to state a claim pursuant to Fed. R Civ. P. 12(b)(6). [ECF No. 17] Plaintiff opposes the motion. [ECF No. 27]

## II. Legal Standard

When ruling on a Rule 12(b)(6) motion to dismiss, the court must accept as true all of the factual allegations in the complaint, but it need not accept legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

---

a claim upon which relief may be granted, or seeks relief against an immune defendant. 28 U.S.C. § 1915(e)(2).

In applying these principles, a court must construe a plaintiff's *pro se* complaint liberally. Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004). Thus, "if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." Jackson v. Nixon, 747 F.3d 537, 544 (8th Cir. 2014) (quoting Stone, 364 F.3d at 915). However, a *pro se* complaint "still must allege sufficient facts to support the claims advanced." Stone, 364 F.3d at 914.

### III. Discussion

#### A. EMTALA claims

Defendant moves for dismissal of Plaintiff's EMTALA claims because Plaintiff "failed to plead factual allegations" suggesting that: 1) she received no screening; 2) she received improper screening for a discriminatory purpose; 3) she received screening that was different from other patients with charley-horse cramps; and 4) she had an emergent condition that Defendant failed to stabilize. [ECF No. 18 at 1] Defendant also urges the Court to either decline to exercise supplemental jurisdiction over Plaintiff's state law medical malpractice claims or dismiss her state law claims for failure submit a written opinion from a health care provider as required by Mo. Rev. Stat. § 538.225. [Id. at 1-2]

In response, Plaintiff asserts that, because Dr. Lowery failed to "carefully read" her chart and did not see Plaintiff until ninety minutes after her arrival to the emergency department, "she was treated differently from other patients and differently from the treatment prescribed by the hospital's normal screening process." [ECF No. 27 at 3, 6] Plaintiff also maintains she stated an EMTALA claim for failure to stabilize because she alleged that "she was discharged and

4

'dumped' in the waiting room area with a 'Fall Risk' arm band on after she complained she felt ill and was going to throw up."[3] [Id. at 3]

Congress enacted EMTALA to "address a distinct and rather narrow problem – the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them."[4] Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1136 (8th Cir. 1996) EMTALA imposes two requirements on hospitals with emergency departments – namely, to screen and to stabilize patients. 42 U.S.C. § 1395dd(a)-(b). The statute provides:

> In the case of a hospital that has a hospital emergency department, if any individual…comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition….exists.[5]

42 U.S.C. § 1395dd(a).

Importantly, EMTALA does not "create[] a general federal cause of action for medical malpractice in emergency rooms." Summers, 91 F.3d at 1137. "Rather,…EMTALA focuses on

---

[3] Plaintiff does not address Defendant's arguments in favor of dismissing her state law claims. Instead, she appears to raise for the first time a claim for intentional infliction of emotional distress. [ECF No. 27 at 8]

[4] By its terms, EMTALA applies to "participating hospitals," meaning hospitals that have Medicare provider agreements with the Secretary of Health and Human Services. See 42 U.S.C. § 1395dd(2); Hunt ex rel. Hunt v. Lincoln County Mem. Hosp., 317 F.3d 891, 893 n. 4 (8th Cir. 2003). Defendant does not dispute that it is a participating hospital.

[5] For purposes of EMTALA, "emergency medical condition" means:
   (A) a medical condition manifesting itself by acute symptoms of sufficient
   severity (including severe pain) such that the absence of immediate medical
   attention could reasonably be expected to result in--
       (i) placing the health of the individual (or, with respect to a pregnant
       woman, the health of the woman or her unborn child) in serious jeopardy,
       (ii) serious impairment to bodily functions, or
       (iii) serious dysfunction of any bodily organ or part[.]
42 U.S.C. § 1395dd(e)(1).

uniform treatment of patients presented in hospital emergency departments." Hunt ex rel. Hunt v. Lincoln Cty. Mem. Hosp., 317 F.3d 891, 894 (8th Cir. 2003). "Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated, within the hospital's capabilities." Summers, 91 F.3d at 1138. Therefore, "a claim under EMTALA requires a showing of a lack of uniform treatment with other similarly situated patients." Mead v. Salem Memorial Dist. Hosp., No. 4:07-CV-452 TIA, 2008 WL 205273, at *3 (E.D. Mo. Jan. 23, 2008) (citing Summers, 91 F.3d at 1138).

1. Duty to screen

Defendant contends that "the fact allegations in Plaintiff's Complaint do not support her claim that [Defendant] failed to appropriately screen her." [ECF No. 18 at 4] While EMTALA does not define the term appropriate medical screening examination, "[m]ost of the courts that have interpreted the phrase have defined it as a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms." Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 323 (5th Cir. 1998) (collecting cases). See also Summers, 91 F.3d at 1138 ("An inappropriate screening examination is one that has a disparate impact on the plaintiff").

The Eighth Circuit has recognized three types of improper screenings that are actionable under EMTALA: (1) "failure to screen at all"; (2) "improper screening of patients for a discriminatory reason"; (3) and "screening a patient differently from other patients perceived to have the same condition." Summers, 91 F.3d at 1139. Defendant argues that Plaintiff's complaint does not state a claim for any of the three categories of failure to screen.

With respect to the first category of failure to screen, the complaint alleged: a nurse talked to Plaintiff, noted her discomfort and "cramps in Rt thigh," and inquired whether an injury had caused the pain in her legs; Dr. Lowery reviewed Plaintiff's chart; and emergency department staff performed blood work and informed Plaintiff of the results. The complaint's factual allegations establish that Defendant's nursing staff and Dr. Lowery examined her, performed blood work, and treated her pain. Accordingly, Plaintiff does not allege that Defendant failed to "screen [her] at all."

As to the second and third failure-to-screen categories, Defendant maintains that the complaint's factual allegations do not support claims that Defendant either failed to properly screen her for a discriminatory reason or screened her differently from other patients perceived to have the same condition. In her complaint, Plaintiff alleged: "Without carefully reading [Plaintiff's] Transit Chart, [Defendant's] Doctor Derrick St. Lowery and staff believed [Plaintiff] to be indigent." [ECF No. 1 at ¶ 27] In response to Defendant's motion to dismiss, Plaintiff elaborates: "Patient Pennington-Thurman arrived at Christian Hospital N.E.'s (CHNE) Emergency Department at 3:45 AM. Dr. Lowery did not see Patient Pennington-Thurman until after 5:00 AM; therefore, she was treated differently from other patients and differently from the treatment prescribed by the hospital's normal screening process." [ECF No. 27 at 3] Plaintiff also states that, in failing to carefully read her medical records, Dr. Lowery "did not provide for an 'appropriate' screening because this action by [Defendant] was discriminatory." [Id. at 7]

Plaintiff did not allege that patients perceived to have insurance and the same medical condition (severe leg cramps) were screened or treated differently than she was. Nor did Plaintiff state how Defendant allegedly deviated from its normal screening process. Nothing in the complaint suggests that Defendant's emergency department staff provided more prompt or

7

thorough screening to patients perceived to have health insurance. Construing Plaintiff's pleadings liberally, the Court finds that she did not plead facts to support a claim either that Defendant screened her differently from other patients with similar conditions or failed to appropriately screen her for a discriminatory reason.

In short, Plaintiff did not plead factual allegations demonstrating a connection between her perceived uninsured status and the screening she received. Plaintiff's allegations that Defendant delayed screening and/or inadequately screened her because Defendant believed she lacked insurance are conclusory and do not raise the right to relief above the speculative level. See e.g., Brown v. Providence Med. Servs., No. 8:10-CV-230, 2010 WL 4534407, at *4 (D. Neb. Nov. 1, 2010); Prickett v. Hot Springs Cty. Med. Ctr., No. 6:07-CV-6050, 2007 WL 2926862, at *3-4 (W.D. Ark. Oct. 5, 2007). As a result, the Court dismisses Plaintiff's claim that Defendant failed to provide appropriate medical screening in violation of EMTALA.

2. Duty to stabilize

Defendant contends Plaintiff failed to state a claim under EMTALA for failure to stabilize her medical condition because the complaint established that Defendant treated her emergency medical condition with pain medication and resolved her pain prior to discharge. EMTALA requires that if, after screening a patient, a hospital determines that the patient has "an emergency medical condition," the hospital must stabilize the patient before discharging or transferring her. 42 U.S.C. § 1395dd(b). See also Summers, 91 F.3d at 1136. The statute defines "emergency medical condition" as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in: (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A).  To "stabilize" an emergency medical condition, a hospital must "provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]"  42 U.S.C. § 1395dd(e)(3)(A).

In her complaint, Plaintiff alleged that Defendant's staff administered an injection of narcotic pain medication sometime before 5:12 a.m. and, at 5:49 a.m., Plaintiff "denie[d] any pain or discomfort" and did "not appear to be in any distress or discomfort."  [ECF No. 1 at ¶ 9-12]  However, when a nurse informed Plaintiff that her blood work was normal and presented her with discharge papers, Plaintiff declined to sign the papers because she did not feel well.  [Id. at ¶ 15]  Plaintiff alleged that she subsequently vomited, but she nevertheless "was wheeled to the waiting room area and left in a wheelchair."  [Id. at 15]  When Plaintiff's sister arrived to pick her up after 8:00 a.m., Plaintiff was "slumped over in the wheelchair."  [Id. at ¶ 16]

There is no dispute that Plaintiff vomited and felt sick when Defendant discharged her.  Defendant maintains, however, that Plaintiff failed to state a failure-to-stabilize claim because the complaint established that Defendant stabilized her emergent medical condition (leg cramps) by providing an injection of pain medication.  Defendant further argues that Plaintiff's allegations – that the hospital knew she did not feel well after a narcotic pain shot, had vomited, and was "slumped" in a wheelchair hours later – could not support a determination that Defendant was aware she had an emergent medical condition that was not stabilized.

In support of its position that the complaint's allegations "do not suggest that the hospital staff was aware that Plaintiff had an emergency medical condition that required stabilization," Defendant relies solely on Torretti v. Main Line Hosps., Inc., 580 F.3d 168 (3d Cir. 2009).  In

9

Torretti, the Third Circuit affirmed summary judgment for the defendants, a fetal monitoring center and its perinatologist, on the plaintiff's claim that they failed to stabilize her before directing her to a hospital for further monitoring. Id. at 178. The court held that EMTALA did not apply to the plaintiff's case because she presented to an outpatient center for a routine appointment, and not to an emergency department. Id. at 176-77. The court nevertheless addressed the plaintiff's failure-to-stabilize claim, and it found there was no evidence that defendants "actually knew that [the plaintiff's] condition was an emergency before directing her to [the hospital.]" Id. at 178. The court reasoned that, although the plaintiff was diabetic and thirty-four weeks pregnant, she failed to establish the defendants had actual knowledge of an emergent medical condition because the plaintiff: had a history of similar pre-term labor contractions; did not present herself as an emergency patient; and did not believe her condition was emergent. Id.

Torretti is not persuasive. Unlike the plaintiff in Torretti, Plaintiff presented to an emergency department, received narcotic pain medication, vomited, and objected to being discharged because she felt ill. Torretti is further distinguishable because it was decided on a motion for summary judgment. When considering a motion to dismiss pursuant to Rule 12(b)(6), the inquiry is the adequacy of the pleadings, not the sufficiency of the evidence. Torretti does not support Defendant's claim that Plaintiff's allegation that emergency department staff observed her vomiting was insufficient to plead the requisite awareness of an emergent medical condition.

In the absence of supporting authority, the Court declines to find on a motion to dismiss either that (1) a reaction to medication that includes vomiting is not an "emergent medical condition" or (2) a patient who vomits and feels ill while in the emergency department is

"stabilized" and therefore fails to state a claim under EMTALA. Accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party, the Court finds that Plaintiff sufficiently alleged that she had an emergent medical condition and Defendant failed to stabilize her condition prior to discharge. See e.g., Estate of Beelek v. Farmington Mo. Hosp. Co., LLC, No. 4:10-CV-2068 CDP, 2011 WL 4008018, at *2-3 (E.D. Mo. Sept. 8, 2011) ("These allegations of [the decedent's] obvious and serious physical distress plausibly support plaintiffs claim that the hospital knew that [the decedent] suffered from an emergency medical condition sufficient to support a claim under § 1395dd(b)."). As a result, the Court denies Defendant's motion to dismiss Plaintiff's failure-to-stabilize claim.

B. Medical malpractice claims

Defendant moves for dismissal of Plaintiff's medical malpractice claims on the ground that Plaintiff failed to comply with Mo. Rev. Stat. § 538.225, which requires a plaintiff in a medical malpractice case to file an affidavit of merit from a health care provider.[6] [ECF No. 18 at 7] Alternatively, Defendant urges the Court to hold a hearing, pursuant to section 538.225.7, to "'determine whether there is probable cause to believe that one or more qualified and competent health care providers will testify that the plaintiff was injured due to medical negligence by [Defendant].'" [ECF No. 18 at 8 (quoting Caplinger v. Rahman, 529 S.W.3d 329 (Mo.App. 2017)] Plaintiff does not address Defendant's argument, but rather appears to raise for the first time a claim for intentional infliction of emotional distress.[7] [ECF No. 27 at 8]

---

[6] Defendant also argued that "[b]ecause Plaintiff's EMTALA claims should be dismissed, her medical malpractice state law claim against [Defendant] should also be dismissed." [ECF No. 18 at 7] As the Court does not dismiss both of Plaintiff's EMTALA claims, it will not address this argument.

[7] The Court will not consider new claims asserted in Plaintiff's response to Defendant's motion to dismiss. See e.g., Witengier v. U.S Bank N.A., No. 4:16-CV-1855 CEJ, 2017 WL 1429047, at 1 n.6 (E.D. Mo. Apr. 21, 2017).

Mo. Rev. Stat. § 538.225 requires a medical-malpractice plaintiff to file with the court an affidavit stating that:

> [H]e or she has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

Mo. Rev. Stat. § 538.225.1. See also Spradling v. SSM Health Care St. Louis, 313 S.W.3d 683, 686 (Mo. banc 2010). The statute defines "legally qualified health care provider" to mean: "a health care provider licensed in this state or any other state in the same profession as the defendant and either actively practicing or within five years of retirement from actively practicing substantially the same specialty as the defendant." Mo. Rev. Stat. § 538.225.2. In other words, the statute requires that the health care provider "actively practice under similar circumstances in order to provide an opinion that a defendant doctor breached the necessary standard of care in the profession and thereby caused a plaintiff's pleaded damages[.]" Kruetz v. Curators of Univ. of Mo., 363 S.W.3d 61, 64 (Mo.App. 2011). "If the plaintiff or his attorney fails to file such affidavit, the court shall, upon motion of any party, dismiss the action against such moving party without prejudice."[8] Mo. Rev. Stat. § 538.225.6.

Plaintiff filed with her complaint an affidavit stating that she obtained the "written opinion" of Dr. Rueckert, who was a "qualified healthcare provider." [ECF No. 1] Plaintiff

---

[8] Unlike Subsection 6, which "governs when the alleged error is a faulty affidavit," Subsection 7 "governs when the alleged error is the expert's written opinion." Spradling, 313 S.W.3d at 686 n.3. Subsection 7 provides:
> [I]f the court determines that the opinion fails to meet the requirements of this section, then the court shall conduct a hearing within thirty days to determine whether there is probable cause to believe that one or more qualified and competent health care providers will testify that the plaintiff was injured due to medical negligence by a defendant.

Mo. Rev. State. § 538.225.7. If the court finds no such probable cause, it must dismiss the case. Id. See also Caplinger, 529 S.W.3d at 330.

further averred that Dr. Rueckert "has found that" Defendant failed to provide Plaintiff "the kind of treatment that a 'reasonably prudent and careful health care provider would have under similar circumstances'" and that failure "caused or contributed to the harm alleged in the lawsuit." [ECF No. 1 at 18]

The opinion that Plaintiff identified and attached to the affidavit is a letter from Dr. Rueckert, Defendant's vice president and chief medical officer. [ECF No. 1-1] In the letter, Dr. Rueckert acknowledged Plaintiff's complaint about the treatment she received on January 31, 2017 and apologized "that we did not contact Dr. Carden during your visit to our emergency department. We want every patient to feel as if they were family and we fell short of that goal."[9] [Id.]

Although Plaintiff refers to Dr. Rueckert as a "qualified healthcare provider," the affidavit does not state whether Dr. Rueckert was actively practicing medicine. Nor did the affidavit identify Dr. Rueckert's area of specialty or establish that Dr. Rueckert practiced "substantially the same specialty" as Dr. Lowery. Finally, contrary to the affidavit's claims that Dr. Rueckert found that Dr. Lowery and Defendant's emergency department breached its standard of care and caused Plaintiff the harm alleged in her complaint, no such opinions appear in the attached letter. [See ECF No. 1-1] While Dr. Rueckert acknowledged that Defendant failed to call her private physician, he expressed no opinion as to the fact or cause of her alleged

---

[9] Dr. Rueckert further wrote:

> I have used this event as a coaching opportunity to share with my team to make sure we have continuous, relentless focus on our patients. Dr. John Oldham, Medical Director for Emergency Services, addressed your concerns with Dr. Lowery and Jim Cadle, Manager of Emergency Services, so as to address your concerns with staff who were assigned to your care. Due to confidentiality, I am unable to disclose the outcome of any specific actions taken as a result of their conversation with the physician and emergency room staff.

[ECF No. 1-1]

pain and suffering. Accordingly, the Court finds that Plaintiff did not satisfy requirements of section 538.225 and dismisses without prejudice Plaintiff's medical malpractice claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to dismiss [ECF No. 17] is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Plaintiff's claims for failure to screen in violation of EMTALA and medical malpractice are **DISMISSED** without prejudice. The case will proceed on Plaintiff's claim for failure to stabilize her medical condition in violation of EMTALA.

                                            PATRICIA L. COHEN
                                            UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of October, 2019